## LANYON v. M. H. DETRICK CO.*
### No. 7941.

Circuit Court of Appeals, Ninth Circuit.
Sept. 28, 1936.

J. E. Trabucco, of San Francisco, Cal. (Max W. Zabel, of Chicago, Ill., of counsel), for appellant.

Miller & Boyken, of San Francisco, Cal., and Cromwell, Greist & Warden, of Chicago, Ill. (Franklin M. Warden and Comfort S. Butler, both of Chicago, Ill., of counsel), for appellee.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Appellee brought suit to obtain an injunction restraining appellant from making, using, or selling any furnace construction embodying the inventions disclosed in the

*Rehearing denied Nov. 23, 1936.

Beall and Foltz patents, both of which are owned by appellee. Appellant asks review of the decree which granted the relief sought by appellee. The patents involved relate to furnace construction.

Witness Nathan E. Lewis, a mechanical engineer, testified on behalf of appellee, and related a part of the history and problems connected with the present day furnaces. It appears that between the years 1910 and 1915 stokers were introduced for use with boiler furnaces, which "permitted the burning of a greater amount of coal per square foot of grate and permitted the generating of more steam from the heating surface under the installations in which they were installed." At the time of the introduction of these stokers, the boilers were installed with the heating surface located from six to seven feet above the fuel bed.

When stokers were used with these so-called "low-set installations," it was difficult to obtain a smokeless combustion "due to imperfect combustion and cramped space." This materially reduced the efficiency of the boiler. The difficulty was overcome by increasing the setting-height of the boiler.

In furnaces, ash particles collected on the walls, and when such material melted it ran down the face of the walls, eroding the refractories or firebrick, which action is called "slag erosion." The firebrick used on the inner wall softened and became plastic at temperatures ranging from 2,000 to 2,400 degrees.

With the installation of the boilers at increased heights trouble developed which caused "shut-downs" for repairs to the walls. The temperature within the furnaces varied from 2,400 to 2,500 degrees. The slag erosion and high temperature caused the refractories to lose their supporting power. The normal expansion of refractories is about one-tenth of an inch per foot when subjected to high temperature, and this expansion sometimes raised the boilers from their foundations. While the temperature on the inside of the wall was about 2,400 degrees, the temperature on the outside of the refractories was from 300 to 700 degrees. Thus there was unequal expansion in the refractories themselves, and the expansion being greatest on the inside of the fire chamber, the refractories had a tendency to assume the shape of a wedge, and drop into the fuel chamber.

To remedy these difficulties, refractory manufacturers were called upon to produce refractories which would withstand the high temperature, withstand slag erosion, and carry greater loads on the sidewalls. Relieving walls were built in the sidewalls of the furnaces to carry the load of the upper portion of the furnace wall. In some instances, laminated metal was used to tie the outer and inner wall together. Bonding tile which extended from and through the outer wall, through the inner wall, to hold the inner wall in alignment, were also used. Hollow blocks or built-in air ducts in the walls were used, through which air was introduced into the furnace at regular intervals just above the fuel bed for the purpose of forming an air film along the side of the inner wall, and chilling the slag so that it would not melt and run down the side of the wall.

Each of these remedies might be successful in one furnace, but a failure in another. No one of them could be used in all furnaces. In 1924 the Bureau of Mines and representatives of operating companies collected data from users of furnaces seeking some remedy for the difficulties outlined. After about a year the American Society of Mechanical Engineers appointed a committee to devise a solution.

About this time the Detrick wall became known. The witness testified: "One or two installations had been made and they were successful. They overcame the plastic deformation due to breaking the wall up into sections so there was no great load on the lower tile of any one section. They provided expansion within the wall so that there was no section exposed to a great accumulated amount of expansion, and they incorporated the air cooling feature which reduced the temperature of the inner face of the wall, preventing the accumulation of slag and to help to reduce softening and deformation."

### The Foltz Patent No. 1,747,822.

The Foltz invention consisted of a combination described as follows: (1) A structural frame; (2) an inner wall, (a) which is made up of sections, (b) each of which consists of more than one component (c) is removable independently of any other (d) and is supported independently of any other (e) by the structural frame (f) through means of brackets held by the frame (g) which brackets have means for anchoring a part of the components of the sections to prevent horizontal displacement; (3) an outer sheathing wall (a) collaterally spaced from the inner wall to make an intervening air chamber (b) in which is lodged the greater part of the heat radiating surface of the brackets; (c) the wall being made up of sections (d) each of which is supported independently of any other (e) by the structural frame.

In the actual assembly of the structure, the brackets, which are made with a flange at their face, corresponding to a horizontal T, are held by horizontal members of the structural frame. At the bottom of the flange of each bracket is a shelf. The refractories are formed with a T slot, to engage the flange of the bracket. A refractory is placed on the shelf of the bracket and others are placed on this one. The highest refractory on a bracket is not held by the flange and is removable horizontally within the fire chamber. After removal of the top refractory of any particular bracket, the others below it to the shelf may be removed. The brackets are placed on the structural frame in a horizontally running series and one above another, so that the entire wall may be built up. The weight of the bracket and the refractories thereon is not transmitted to any other bracket or its refractories, but to the structural frame. The brackets are so spaced that expansion joints can be made between brackets. The intake of air in the aperture of the walls may be regulated.

Appellant's method is identical to that of Foltz, and includes all the elements specified above. The only difference in form noted, is the method of anchoring refractories. As mentioned, Foltz anchors the refractories by means of a flange at the face of the bracket, with which the T slots of the refractories engage. Appellant anchors the refractories by using a casting of somewhat "horseshoe" shape, which engages the refractories at the two ends of the castings, and is looped around a vertically supported angle bar. The angle bar is supported by a socket in a lower bracket and a lug in the upper adjacent bracket.

Appellant admits infringement of eight claims of the Foltz patent, if such claims are held valid. He admits infringement of the other nine claims, if held valid, depending on the meaning of the word "hanger." We believe that the difference between the two forms is only formal, and that appellant's construction is equivalent to that disclosed by the Foltz patent.

■ In examining a previous patent we are not limited to the precise scope of the claims of the earlier patent, but our inquiry is directed to "what is disclosed in specification and made known to the world." Minerals Separation Corporation v. Magma Co., 280 U.S. 400, 402; 50 S.Ct. 185, 74 L. Ed. 511. See, also, Milburn Co. v. Davis, etc., Co., 270 U.S. 390, 46 S.Ct. 324, 70 L. Ed. 651. However, with respect to the claims of the Foltz and Beall patents, appellee is bound by those claims. The specification may be referred to, to limit the claims, and to explain and illustrate them, but they cannot be enlarged by the specification. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122; McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800; Keystone Bridge Co. v. Phoenix Iron Co., 95 U.S. 274, 278, 24 L. Ed. 344; Magnavox Co. v. Hart & Reno (C.C.A.9) 73 F.(2d) 433, 438.

In Roberts v. Ryer, 91 U.S. (1 Otto) 150, 157, 23 L.Ed. 267, it is said: "It is no new invention to use an old machine for a new purpose. The inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not." Many cases sustain this rule.[1] But as said in Ansonia Co. v. Electrical Supply Co., 144 U.S. 11, 18, 12 S.Ct. 601, 604, 36 L.Ed. 327: "On the other hand, if an old device or process be put to a new use, which is not analogous to the old one, and the adaptation of such process to the new use is of such a character as to require the exercise of inventive skill to produce it, such new use will not be denied the merit of patentability."

These two rules are stated in Potts & Co. v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 199, 39 L.Ed. 275, as follows: "As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

Still another rule is found in Hailes v. Van Wormer, 20 Wall.(87 U.S.) 353, 368, 22 L.Ed. 241, as follows: "It must be conceded that a new combination, if it produces new and useful results, is patentable, though all the constituents of the combination were well known and in common use before the combination was made. But the results must be a product of the combination, and not a mere aggregate of several results each the complete product of one of the combined elements. Combined results are not necessarily a novel result, nor are they an old result obtained in a new and improved manner. Merely bringing old devices into juxtaposition, and there allowing each to work out its own effect without the production of something novel, is not invention. No one by bringing together several old devices without producing a new and useful result the joint product of the elements of the combination and something more than an aggregate of old results, can acquire a right to prevent others from using the same devices, either singly or in other combinations, or, even if a new and useful result is obtained, can prevent others from using some of the devices, omitting others, in combination." See, also, Powers-Kennedy Co. v. Concrete Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278, and cases cited.

■ For brevity, we will not quote the claims. Claim 7 consists of a combination of a structural frame, to which brackets are attached, and on these brackets are placed refractories, which form wall sections, and together these sections form an inner wall. Each wall section is supported

---

[1] Paramount Corp. v. Tri-Ergon Corp., 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997; Radio Corp. v. Radio Laboratories, 293 U.S. 1, 14, 55 S.Ct. 928, 79 L.Ed. 163; Powers-Kennedy Corp. v. Concrete Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L. Ed. 278; Corona Co. v. Dovan Corp., 276 U.S. 358, 369, 48 S.Ct. 380, 72 L.Ed. 610; Hobbs v. Beach, 180 U.S. 383, 390, 21 S. Ct. 409, 45 L.Ed. 586; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 493, 20 S.Ct. 708, 44 L.Ed. 856; McCarty v. Lehigh Valley Railroad Co., 160 U.S. 110, 118, 16 S.Ct. 240, 40 L.Ed. 358; Market Street Railway Co. v. Rowley, 155 U.S. 621, 629, 15 S.Ct. 224, 39 L.Ed. 284; Belding Mfg. Co. v. Challenge Corn-Planter Co., 152 U.S. 100, 107, 14 S.Ct. 492, 38 L.Ed. 370; Grant v. Walter, 148 U.S. 547, 553, 13 S.Ct. 699, 37 L.Ed. 552; Lovell Manufacturing Co. v. Cary, 147 U.S. 623, 627, 13 S.Ct. 472, 37 L.Ed. 307, and cases cited.

independently by the structural frame through the brackets. This combination was clearly anticipated by Stevens in furnace arch construction. In the arch construction the bracket is formed with a convex surface, and is bolted at the top thereof to the frame. Appellee's brackets or hangers are claimed to be "in tension relationship to the upper frame member and in compression relationship to the lower frame member." With the benefit of the Stevens patent, it would take no more than skill to change the method of attaching the brackets to the frame, and in making the brackets with a vertical face instead of a round face. This claim likewise seems to be anticipated by Alston in his concrete stack, which consisted of a solid concrete shell with brackets imbedded therein, upon which were placed fire brick. The differences between the substances of the structural frame and the method of attaching the brackets thereto are not significant.

Claim 14 covers the same combination as claim 7 with the addition of means on the bracket for anchoring certain of the refractories. However, the Stevens patent has the identical means of anchoring the refractories claimed. Both the Foltz and Stevens brackets have flanges at the face of the bracket, with which the refractories engage by means of a T-slot. Stevens patent clearly anticipates claim 14.

In claim 15, a combination is claimed consisting of refractories arranged to form wall sections, supported by brackets which in turn are supported by the structural frame. From the discussion of the Alston and Stevens patents above, it will be seen that both of these patents anticipate the combination set forth in claim 15.

Claim 17 is a combination consisting of a structural frame, on which are supported hangers, which support refractories to make an inner wall, and in addition, an outer sheathing wall, collaterally spaced from the inner wall to form an air space between the two walls. The Alston patent discloses two walls. The outer wall has two functions, in that it serves as both the structural frame and the sheathing wall. Here again it would take only skill to add another element to take over the function of the wall in acting as a framework, leaving the outer wall to serve only as an outer sheathing wall. In addition Pelton in 1895 obtained a patent for his construction of buildings. He used a structural frame, to which brackets were attached. These brackets are attached to the frame in a different manner and support masonry horizontally instead of vertically. The inner wall of the building is not shown, but of course it is common knowledge that such walls are universally used. The teaching of Stevens and Pelton when combined would be a mere aggregation of results. In addition to the above cases, see Mettler v. Peabody Engineering Corp. (C.C.A.9) 77 F.(2d) 56.

Claim 23 is slightly different from claim 14. In claim 23 a combination is described, consisting of a structural frame, to which brackets are attached, which brackets support refractories, some of which are anchored to the brackets, and others placed on top of the anchored ones, so that those refractories, not anchored, are removable independently of any others in the wall. Stevens anticipated this claim. As shown under claim 14, the means of anchoring are identical. Both Stevens and Foltz place refractories on top of the anchored refractories, and refractories in each construction which are not anchored are removable independently of each other.

With respect to claim 35, we can see no distinction between this claim and claim 14. The only difference apparent is that claim 35 describes an expansion joint. The joint is not an element. It is merely a space left between the top refractory of the next bracket above. It is obtained merely by spacing the brackets. With the independently supported wall sections, which were old, the spacing could be accomplished by mechanical skill and will not impart invention to a combination otherwise invalid.

In claim 36 a combination is claimed which has no substantial difference to the combination claimed in claim 14. Although stated in different language, there seems to be no difference. It is invalid for the same reason that claim 14 is invalid.

Claim 37 is the same as claim 36 with the expansion joint discussed in claim 35 added. What was said above with reference to claim 35, is here applicable, and claim 37 is invalid.

The differences between claim 38 and claim 14, are that the former specifies that the hangers are placed "in horizontally running series disposed one above another," and that the hangers have "shelf portions disposed laterally of the frame" which support the refractories. These are not substantial differences. Stevens showed the

◊

brackets or hangers in a "horizontally running series." Duplication of such rows downward would occur to the person of skill. Stevens likewise used the shelf portion, describing it as "stop member" in his specification. Stevens anticipated the combination set out in claim 38.

Claim 39 is the same combination as claim 38, but also includes an outer wall supported by the frame, spaced collaterally of the inner wall to afford an air space between the walls. What was said with respect to claim 17 is here applicable. In addition, Stevens constructed his hangers with what is similar to an I-beam at the back thereof. Between the flanges thus made, he placed brick, which, said Stevens "maintains an open space for the circulation of air over the outer ends of those refractories and the frame members. This is of distinct importance in prolonging the life of the refractories, as by this exposure to air which is afforded to each of them by this construction, an additional safeguard is afforded against their destructive overheating and dissipation of heat from the metallic frame members is promoted." Claim 39 is invalid.

Claim 41 differs from claim 38 in that the combination of claim 41 specifies that the wall sections are independently removable. This adds nothing to the combination, for Stevens anticipated it. In the specification for that patent, we find that "Thus replacement of refractories on any of the frame members [hangers] may be made without the necessity for dismantling refractories from associated frame members."

Claim 43 is invalid for the same reasons specified for the invalidity of claim 38. We see no difference whatever between the two claims.

The combination specified in claim 48 consists of a frame, supporting wall sections arranged one above another, each being independently supported by the frame, with means anchoring the sections against horizontal displacement, and an outer sheathing wall made up of sections independently supported on the frame. We are unable to find a substantial difference between this claimed combination and that of Stevens. It is true that Stevens did not show rows, one above another, but as hereinbefore stated, we believe this would occur to the skilled worker.

Claim 49 is the same as claim 48, except that the former specifies that the frame shall include horizontal members, upon which the furnace wall sections and the sheathing wall sections are independently supported. The Stevens patent is not distinguished because he also supported the sections on "horizontal members." We need not discuss, therefore, the question as to whether or not the independent support of the sections, could be as well accomplished by vertical members as it could by horizontal members.

The combination described in claim 50 consists of a frame supporting a furnace chamber wall with metallic members connecting the frame and wall, and a sheathing wall spaced from the inner furnace wall to make an air chamber in which substantial areas of the metallic members are exposed. Probably the Stevens patent above anticipates the combination specified in this claim. However, it can be considered as nothing but an aggregation of the results of Stevens and Alston, and as such, invalid.

In claim 53, a combination is described comprising a frame made of vertical and horizontal members, the latter of which support hangers, which have co-operation with two of the horizontal members, and refractory wall sections supported by the hangers. There is no substantial difference between this claim and claim 7. For the same reasons mentioned regarding claim 7, claim 53 is invalid.

The broadest of all the claims in issue is the last, claim 55, which is as follows: "A furnace structure comprising in combination, a frame, a sheathing wall, a furnace chamber wall spaced collaterally from the sheathing wall to afford an intervening air chamber, said furnace chamber wall being formed of refractories arranged in wall sections, metallic members supported on the frame and supporting adjacent chamber wall sections independently, said metallic members having anchoring connection with refractories in the wall sections and having heat radiating portions exposed in the air chamber." From what has been said, it is apparent that the Stevens patent anticipates the combination contained in this claim. To be sure a few changes in the Stevens construction would have to be made, such as the method of attaching the brackets to the frame, removal of the convex face on the brackets, and perhaps the frame itself. All of these, however, would, we believe, occur immediately to one skilled in the art. We believe this claim to be anticipated by the Stevens patent.

### The Beall Patent No. 1,773,339.

In Beall's construction, a bracket is used, corresponding somewhat to the letter x. A structural frame is used having both vertical and horizontal members. The horizontal members are I beams and are belted to the vertical members, so that the flanges are vertical, and the end resembles the letter H. The lower right foot of the x bracket is placed on top of the horizontal member, with the foot of the bracket between the flanges of the horizontal member. The right upper end of the x bracket is placed inside the outer lower flange of the next higher horizontal member, and is thus supported. On the upper left point of the x bracket is a shelf which supports a vertical tier of refractories, extending upward to the top of the bracket immediately above it. Immediately below the shelf of the bracket is a vertical flange. The refractories used at this point are cap-blocks with grooves in their sides to engage one side of the flange, thus anchoring the cap blocks. The left lower foot of the x bracket engages a slot in the base-block refractory of the next lower bracket. The refractories between the cap-block and the base-block are not anchored. Thus one bracket supports a tier of refractories above it, and locks or "ties-back" the cap-block and lower block of a tier supported by a lower bracket.

The sections thus made are independently supported and are also independently removable. Small unlocked spacer blocks are inserted between two cap-blocks, so that on removal of the spacer block, the cap-block may be moved laterally in the space so left, and thereby freeing itself of the flange on the bracket so that the cap-block may be removed, and then the remaining refractories below the cap-block to the base-block may be removed.

The two claims in issue are as follows:

"1. In furnace wall construction, an outer wall, horizontal vertically spaced supports on the outer wall, superimposed brackets mounted on lower supports and anchored to upper supports and carrying the inner wall in spaced relation to the outer wall, and means for locking the inner wall to the supports.

"2. In a furnace wall construction, an outer wall, a framework re-enforcing the wall, an inner wall comprising · superimposed sections, brackets hooked to the framework of the outer wall, seats on the brackets engaging under the wall sections, and a foot on each bracket for engaging the top of the next lower section."

A French patent, No. 585032, corresponding to the Foltz patent here in issue, and the French patent No. 606369 also appear to anticipate these claims, and the Stevens patent we think also anticipates them. The brackets are attached in a somewhat different manner than Foltz attached his brackets, and lock some of the refractories in a different manner. It is, we believe, a case of substitution of equivalents. The Beall bracket is substantially the same, is used in substantially the same way, to produce the same result, and by reason thereof, the two claims in issue are invalid.

Reversed.

